## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

In re:

Union Hospital District,

             Debtor.

Case No.
Chapter 9

**APPLICATION FOR AN ORDER (1) DIRECTING AND APPROVING NOTICE; AND (2) SETTING DEADLINE FOR FILING OBJECTIONS TO PETITION**

Union Hospital District ("Debtor"), hereby applies for an entry without a hearing of an order: (1) approving the proposed form of notice of commencement of this case pursuant to 11 U.S.C. § 923 and (2) setting a deadline for the filing of any objections to the petition initiating this chapter 9 case pursuant to 11 U.S.C. § 921.   A proposed Order is attached hereto as Exhibit 1.   In support of this application, the Debtor incorporates by reference its Memorandum in Support of its Statement of Qualifications Under 11 U.S.C. § 109(c) filed on even date herewith, and the Debtor would respectfully show unto this Court the following:

### I.  BACKGROUND

The Debtor filed a petition seeking relief under chapter 9 of the United States Bankruptcy Code ("Bankruptcy Code") on June 6, 2014.  The Debtor, a public agency, was created in 1946 by act of the South Carolina Legislature to provide hospital facilities to the residents of Union County (the "County").   The Debtor operates, controls, and manages all matters concerning Union County's health care functions, including the (1) Wallace Thomson Hospital, (2) Ellen Sagar Nursing Home, (3) Carolina Health Associates, and (4) Union County EMS. The debts of the Debtor consist primarily of various leases of medical equipment and ordinary course of business unsecured trade debt.  For financial reporting purposes, the Debtor maintains separate records of income and expenses for each of its four service areas, but also consolidates the

financial results into a consolidated financial statement. *See* Declaration of Paul R. Newhouse filed on June 6, 2014, a copy of which is attached as Exhibit 3.

Debtor has considered alternatives to address its obligations outside of bankruptcy, but has deemed a chapter 9 necessary as more fully set forth in the Memorandum in Support of its Statement of Qualifications Under 11 U.S.C. § 109(c). On June 5, 2014, the Debtor's Board voted to authorize the Debtor to file a petition for bankruptcy under chapter 9 of the Bankruptcy Code. The Debtor filed its chapter 9 petition on June 6, 2014.

## II. ARGUMENT

### A.    The Proposed Order Providing Notice is Appropriate.

Section 923 of the United States Bankruptcy Code requires that notice of the commencement of a chapter 9 case and notice of an order of relief under chapter 9 be given. Section 923 further requires that this notice must be published at least once a week for three successive weeks in: (1) at least one newspaper of general circulation published within the district in which the case is commenced; and (2) in such other newspaper having a general circulation among bond dealers and bondholders as the court designates. 11 U.S.C. § 923. As further discussed below, Debtor is requesting that the Court not require the Debtor to publish notice in national business publications such as *The Wall Street Journal* or *The Bond Buyer* because the Debtor does not have any outstanding bonds.

The Debtor submits that the proposed Order, attached hereto as Exhibit 1, satisfies the requirements of 11 U.S.C. § 923. The Order provides notice of the automatic stay and deadlines for objection to the petition, and provides that, if no objection to the petition is filed within the specified time and date, the Order will constitute notice of the entry of an order for relief. The Order also lists the persons that must be served with any objection.

The proposed Order provides for publication in the *Union Daily Times*, *Spartan Weekly News*, *Greenville News*,[1] and *The State*.  All three of these regional publications and *The State* are newspapers of general circulation which are published within the District of South Carolina. These newspapers are appropriate for providing notice of the case as they are widely read in the geographical vicinity of the Debtor and their readers are likely to include creditors of the Debtor and other persons or entities with an interest in the activities of the Debtor and events in this case.  The Debtor submits that publication of the proposed Order in these newspapers constitutes good and sufficient notice and is consistent with the requirement of 11 U.S.C. § 923.  The Debtor intends to begin publishing the Order in these newspapers immediately after the Court's approval thereof, once per week for three consecutive weeks as provided in section 923.  The Debtor understands that the Clerk of Court will mail the Order to the United States Trustee and, using the mailing matrix filed with the Debtor's chapter 9 petition, to all entities identified in the List of Creditors filed by the Debtor pursuant to 11 U.S.C. § 924.

While section 923 provides for notice in a newspaper having a general circulation among bond dealers and bondholders as the court designates, the Debtor does not believe such publication is necessary in this case as the Debtor does not have any outstanding bonds or bond obligations.  *See* Declaration of Paul R. Newhouse, ¶ 7.  The publications typically used for such compliance with this requirement would be *The Wall Street Journal* or *The Bond Buyer,* which are national publications relied upon by bond traders and dealers.  Legal advertising in these publications is extremely expensive.  Although such an expense would have to be incurred if the debtor had any outstanding bonds, the circumstances in this case do not justify imposition of such an expense. The debts of this Debtor consist of ordinary course of business notes with

---

[1] The *Union Daily Times*, *Spartan Weekly News*, and *Greenville News* are each local weekly papers which news items and events in and surrounding Union County.  See Exhibit 2 hereto, for excerpts from each of these three publications.

3

financial institutions and unsecured trade debt.  *Id.*    As there are no bondholder creditors involved in this matter, publication in a newspaper having a general circulation among bond dealers and bondholders is not necessary.

**B.      It is Appropriate to Order that Objection to Debtor's Petition be Filed by July 14, 2014.**

11 U.S.C. § 921(d) provides for the entry of an order of relief unless the chapter 9 petition is dismissed under Section 921(c).  Section 921(c) authorizes the dismissal of a chapter 9 petition, if, after an objection to the petition is filed, the court determines that the petition was not filed in good faith, or that the petition does not meet the requirements of title 11 of the United States Bankruptcy Code.   While 11 U.S.C. § 921(c) details the possibility of objections to a chapter 9 petition, there is no set deadline for filing such objections.   Accordingly, Debtor requests the court set a deadline for the filing of any objections to Debtor's chapter 9 petition.

Providing a deadline by which parties must submit objections to Debtor's chapter 9 petition is both prudent and practical as it would remove the uncertainty created by the absence of specific timing provisions in section 921.   Parties should not be permitted to an unlimited timeframe within which to objection to Debtor's petition regardless of whether a particular party is acting in good faith or seeking to gain leverage in this case.   To expedite the entry of an order of relief in this case, the Debtor requests that the deadline for filing objections be established as, July 14, 2014, a date 38 days from the petition date and approximately 17 days after the last anticipated weekly publication.[2]

---

[2] Debtor anticipates beginning publication by June 12, 2014, in *The State* and the *Spartan Weekly News*, and by June 13, 2014, in *Union Daily Times* and the *Greenville News*, with the last anticipated publication occurring on or about June 27, 2014, in the *Union Daily Times* and the *Greenville News.*

DM: 3713153 V.2

### III.  CONCLUSION

Wherefore, the Debtor respectfully requests the that Court enter an order;

1.      approving the form of notice filed concurrently as Exhibit 1;

2.      approving the manner of publication in the *Union Daily Times*, *Spartan Weekly News*, *Greenville News,* and  *The State* as set forth in the Order;

3.      directing the Clerk of Court to mail the Order to all creditors listed on the Debtor's List of Creditors filed pursuant to 11 U.S.C. § 924 and in accordance with Bankruptcy Rule 1007 (e);

4.      establishing July 14, 2014, as the deadline for filing objections to the Debtor's chapter 9 petition;

5.      establishing August 29, 2014, as the deadline to file proofs of claims; and

5.      granting such other and further relief this Court deems just and equitable.


**HAYNSWORTH SINKLER BOYD, P.A.**

**By:**      /s/Stanley H. McGuffin
            Stanley H. McGuffin
            District ID No. 2833
            Louise M. Johnson
            District ID No. 7509


            Post Office Drawer 11889
            Columbia, South Carolina 29211
            (803) 779.3080 Tel
            (803) 765.1243 Fax
            smcguffin@hsblawfirm.com
            cjohnson@hsblawfirm.com

June 6, 2014                          Attorneys for Union Hospital District

DM: 3713153 V.2

## IN THE UNITED STATES BANKRUPTCY COURT
### DISTRICT OF SOUTH CAROLINA

In re:

Union Hospital District,

        Debtor.

Case No.
Chapter 9

## ORDER UPON COMMENCEMENT OF CHAPTER 9 CASE ESTABLISHING CERTAIN DEADLINES AND NOTICE OF COMMENCEMENT OF CASE, OF THE AUTOMATIC STAY AND OF THE ORDER FOR RELIEF

**TO:    The Debtor, Creditors, Special Taxpayers, and Other Parties in Interest:**

IT IS ORDERED that Union Hospital District ("Debtor") shall give notice of the following by first class mail to parties in interest and shall file with the Court proof of such service within three (3) business days, and shall also publish this Order giving notice of the commencement of the case in *The State, Union Daily Times, Spartan Weekly News*, and the *Greenville News* as required by 11 U.S.C. § 923. Proof of Publication shall be filed with the Court not later than ten (10) days after the last publication.[1] The last publication shall not be less than ten (10) days prior to the last day to file objections to the petition.

IT IS FURTHER ORDERED that the Debtor shall file, on or before June 16, 2014, the list of creditors and claims required by 11 U.S.C. §§ 924 and 925 and Fed. R. Bankr. P. 1007(a), (d), and (e).

IT IS FURTHER ORDERED and notice is hereby given of:

1.    **Notice of Commencement of Case under Chapter 9.** A case under Chapter 9 of the Bankruptcy Code was commenced by the filing of the petition of the Debtor on June 6, 2014. All documents filed with the Court are available for inspection, on a subscription basis, through the Court's CM/ECF website, https://ecf.scb.uscourts.gov. For subscription information, please see the website for the Public Access Court Electronic Records, http://pacer.psc.uscourts.gov.

2.    **Notice of Automatic Stay.** The filing of the petition operates as a stay applicable to all entities of the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against an officer or inhabitant of the Debtor that seeks to enforce a claim against the Debtor and the enforcement of a

---

[1] Based on statements and the supporting affidavit in the Debtor's Application for An Order (1) Directing and Approving Notice; and (2) Setting Deadline for Filing Objections to Petition, that the Debtor does not have any outstanding bonds, the Court has determined that notice in publications that might be more widespread *or have a general circulation among bond dealers and bondholders is unnecessary. See* 11 U.S.C. § 923.

**EXHIBIT**

tabbies

**1**

lien on or arising out of taxes or assessments owed to the Debtor, and certain other acts and proceedings against the Debtor and its property as provided in 11 U.S.C. §§ 362 and 922.

3.  **Notice of Time for Filing Objection to the Petition.** Objections to the petition may be filed by a party in interest not later than July 14, 2014. Objections shall be filed with the Clerk, U.S. Bankruptcy Court for the District of South Carolina, and a copy of objections shall be mailed to the attorney for the Debtor. All objections shall state the fact and legal authorities in support of such objections. If any timely objection are filed with the Court, the Court will schedule a hearing to determine whether this case may be dismissed pursuant to 11 U.S.C. § 921(c) or whether an order for relief may be entered pursuant to 11 U.S.C. § 921(d).

4.  **Notice of time for filing Proofs of Claim.** The Debtor has or will file a list of claims. Any creditor holding a listed claim which is not disputed, contingent, or unliquidated as to amount, may, but need not, file a proof of claim in this case by the date below. Creditors whose claims are not listed or whose claims are listed as disputed, contingent, or unliquidated as to amount and who desire to participate in the case or share in any distribution must file their proofs of claim on or before August 29, 2014. Any creditor who desires to rely on the list has the responsibility for determining that their claim is accurately listed.

5.  **Notice of Order for Relief.** In the absence of any objection to Debtor's chapter 9 petition by the Objection Deadline, this order shall serve as notice of entry of an order of relief.

**AND IT IS SO ORDERED.**

DM: 3713163 V.1



Articles

search

uniondailytimes.com   add HBO and Cinemax
get the first 3 months free

| Home | News | Sports | Obits | Opinion | Local Features | Calendar | Entertainment | Classifieds | Businesses | Manage My Subscription |

Home »

### Featured Story



**Parade to honor Lady Jackets, Percussion Ensemble**

16 hours ago | 0 Comments   |   Like { 6 } |

UNION COUNTY — A parade through the streets of Union will be held Thursday to honor the Union County High School Yellow Jackets softball team and the Union County High School Indoor Percussion Ensemble in a statement released Tuesday afternoon, Jeff Simbile, Director of Personnel and Student Services for the Union County School D-strict, announced that a parade will be held in honor of the UCHS Yellow Jackets softball team and Indoor Percussion Ensemble on Thursday at 4:30 p.m. The parade will begin on Main Street at the Union County YMC and end at the Union County Courthouse.



AdChoices

NORDSTROM
MENS SHOP

SHOES
SPRING 2014

SHOP NOW ›

FREE SHIPPING. FREE RETURNS.
ALL THE TIME.



**Remembering those who gave their lives for their country**

UNION — Those "who lost their lives in war that we might live in peace" were remembered Monday morning during a Memorial Day ceremony at the Main Street War Memorial in downtown Union Monday's ceremony was sponsored by American Legion Post 22 which, in a press release announcing the event, stated that its purpose was to "honor all the members of our military who lost their lives in war that we might live in peace." During the ceremony, ...

16 hours ago | 0 Comments   |   Like { 0 } |

**Weather**

 Union, SC
92° Clear
Feels Like: 93 °
Relative Humidity: 37%



**Students raise, study chickens in science class**

BUFFALO — The life cycles of animals ranging from chickens to butterflies to tadpoles and mealworms were the subject of studies by some students at Buffalo Elementary School Debra Hyatt's second grade class studied the life cycles of the animals which were raised in the classroom during the final nine weeks of the current school year "We're studying animal life cycles and their habitats," Hyatt said. "The students observe and keep a j

16 hours ago | 0 Comments   |   Like { 1 } |


OLD NAVY
SALE

Women's 3/4-Sleeve Fit &
Flare Dresses

Now $24.97

SHOP NOW



**Kyle Larson takes the checkered in Nationwide History 300**

CHARLOTTE, N.C. — Charlotte Motor Speedway is becoming a winning thing for team owner Chip Ganassi Kyle Larson, the rookie Sprint Cup driver for Ganassi, captured his second Nationwide Series victory this season by winning the History 300. It comes on the heels of last week's million dollar win in the All-Star race by teammate driver Jamie McMurray "I think I just had a really great car. We were fast in practice on Thursday and barely worked on it, reall...

16 hours ago | 0 Comments   |   Like { 0 } |

**Local Gas Prices**   Sponsored By

**Lowest Gas Prices in Union**
Union Gas Prices provided by GasBuddy.com

**Johnson ends 2014 drought by winning Coca-Cola 600**

CHARLOTTE, N.C. — It started Thursday with the pole award and ended Sunday night in Victory Lane. Jimmie Johnson and his #48 Lowes team culminated a commanding weekend by winning the Coca-Cola 600 at Charlotte Motor Speedway The win was his first this season, as many followers wondered when, not if it would happen "It's great to win, but believe me, and I promise you, all the hype and all the concern and worry, that was elsewhere That wasn't in m...

16 hours ago | 0 Comments   |   Like { 0 } |


NORDSTROM
KIDS'
CROCS

NEW SPRING STYLES

SHOP NOW

FREE SHIPPING. FREE RETURNS.
ALL THE TIME.

**UNION PUBLIC SAFETY**

**Crime Report**

The Union Public Safety Department reported the following arrests: — Chane Trandous Hardy, 31, of 402 South Mountain Street, Union, was charged with malicious damage to property around 10:10 a.m. May 25. According to the arrest warrant, Hardy broke a window out of a woman's apartment located on Industrial Park Road, Union, after the woman refused to let him inside — Kenneth Lamar Norman, 30, of 208 Monroe Street, Union, was charged with

16 hours ago | 0 Comments   |   Like { 0 } |

**Church Calendar**

**Featured Business**

EXHIBIT
2

Hotels & Lodging      Services
Health Care           Shopping

Businesses            Coupons

**Community Calendar**

Wednesday, May 28• The Union County Council Committee on Public Health and Social Services meets at 6 p.m. in the Grand Jury Room at the Union County Courthouse to discuss the affiliation plans for Wallace Thomson Hospital. The public is invited to attend Monday June 2-Thursday, June 5 and Monday, June 9-Thursday June 12

16 hours ago | 0 Comments   |   Like  ⟨ 0 ⟩ |

‹ First  «  [1]  2  3  4  5  »  Last ›

**Community Directory**

Spartanburg Community College

Kimbrell's Furniture

Oakmont of Union

Union County Sheriff's Office

USC Union



NORDSTROM

STELLA MCCARTNEY
PRE-FALL 2014

Now available online.
SHOP NOW ›

FREE SHIPPING. FREE RETURNS.
ALL THE TIME.

**Most Recent Issue**



**Home**
About Us
Contact Us
Subscribe

**News**
Online Forms
Submit a Story

**Sports**
Submit a Story

**Opinion**
Editorials
Letters
Send a Letter

**Local Features**
Contests
Online Forms
MyOwn Union

**Calendar**
Post an Event

**Entertainment**

**Businesses**

**Classifieds**

**Manage My
Subscriptions**

**Contact Information**

Business Address
100 Times Boulevard, Union
SC, 29379

Primary Phone:
864-427-1234

Primary Fax:
864-427-1237

© 2014 "Civitas Media" and "civitasmedia.com". All rights reserved | Terms of Service Agreement



# News

Home | About us | Locations | News | Legal Notices | Subscriptions | About
Master in Equity Sales | Current Master Sales | Advertising | Contact us |
Links



Iris Laudig's photo (above) won first place in the Spartanburg Soaring! Photography Contest.

# *Spartanburg Soaring!* Photography Contest winners announced

The *Spartanburg Soaring!* Photography Contest kicked off in early February of 2014, sending budding and professional photographers on a quest to capture the "soaring spirit" of Spartanburg. All submissions went on display at Chapman Cultural Center in late April, and winners were revealed during Spring Fling in May. Third place went to Chad Blotner, second place to Richard Avakiam, and first place to Iris Laudig.

Laudig's photo, taken at the *Spartanburg Soaring!* International Kite Festival on March 30, depicts the iconic *Exuberance* statue at Barnet Park backed by a brilliant blue sky that is filled with dozens of kites. The second place photo by Avakian takes another approach, depicting professional cyclists riding through Spartanburg, a city noted as a Bicycle Friendly Community by the League of American Bicyclists. Blotner's image, also taken

from the Festival, shows a mother and child in black and white sitting in the grass behind Chapman Cultural Center looking up in awe.

The Contest was judged by Rick Sammon who is commonly called "the Godfather of Photography." A prolific international professional, Sammon is one of the most active photographers in the world.

"All three images are magnificent representations of what *Spartanburg Soaring!* was, is, and will continue to be," President and CEO of Chapman Cultural Center Jennifer Evins said. "It's a celebration of our soaring successes as a people and as a community."

Submissions to the Photography Contest are currently on display for free at Chapman Cultural Center on the second floor of the Carlos Dupre Moseley Building.

The *Spartanburg Soaring!* initiative, spearheaded by Chapman Cultural Center, began in January and lasted through May, featuring dozens of events in conjunction with over two dozen community partners. The Photography Contest was one such event, organized by Chapman Cultural Center, Spartan Photo Center, and Spartanburg Photography Guild.

Spartanburg Soaring! was funded in part by The Phifer-Johnson Founda-tion, The Spartanburg County Foundation, The Humanities Council SC, Mary Black Foundation, SEW Eurodrive, and Prices' Menswear.

# City Council approves 2015 budget, agrees to support co-op grocery store

At their meeting on Tuesday, May 27th, Spartanburg City Council gave unanimous approval to the City's budget for fiscal year 2015, which begins July 1. Included in budget is a small property tax millage increase of up to 1.9 percent, which amounts to $8 on a $100,000 home, as well as a $6 increase in the annual fee the City charges residents for waste pickup, which includes garbage, recycling, bulk and green waste.

Also included in the budget is a 1.5 percent employee cost-of-living pay increase, approximately $100,000 for mandatory increases in the City Employee retirement, a five percent increase in medical insurance cost, $220,000 for building facilities maintenance, $100,000 towards construction of a new T.K. Gregg recreation facility sinking fund, and $379,512 for quality of life projects The budget will receive a second reading at Council's next meeting on June 9. Click here to view the full budget document.

Council also voted 5-2 to approve a plan to assist Hub City Co-op in opening a grocery story Downtown. Under the plan the City will match $350,000 in private funding to be raised by the Co-op, with $200,000 coming in the form of a zero interest loan to be repaid over seven years. The remaining $150,000 will disbursed in a grant paid monthly over four years. Council members Robert Reeder and Jerome Rice voted against the agreement.

### Three Spartanburg County students graduate from S.C. Governor's School for Science & Mathematics

Killian Glenn, Trent Large and Rachel Quick, all from Spartanburg County, graduated from the SC Governor's School for Science & Mathematics (GSSM) on Saturday, May 31, in Hartsville.

Killian, son of Megan McFarland and Brent Glenn, plans to attend Oxford College of Emory Universtiy. Trent, son of Tonya Chavis and Charlie Chavis, plans to attend Duke University. Rachel, daughter of Danelle & James Quick, plans to attend Clemson University.

GSSM, recently named one of the Top-Performing U.S. Schools by The Washington Post, specializes in the advanced study of science, technology, engineering and math (STEM).

### 2014-15 officers named for Greenville Area Development Corporation Board of Directors

Greenville — The Greenville Area Development Corporation (GADC), the county-chartered organization

tasked with promoting and enhancing the economic growth of Greenville County, has announced the appointment of four Upstate leaders as officers of its Board of Directors for 2014-2015.

Richard (Dick) Wilkerson was named as chairman for 2014-2015, succeeding Greenville Tech Foundation President Bob Howard in that position. Mr. Wilkerson is joined by S. Hunter Howard, Jr. as Vice Chairman, Marshall E. Franklin as Treasurer, and Dr. Tom E. Quantrille as Secretary.

Mr. Wilkerson served as Chairman and President of Michelin North America from 2008 to 2011, prior to which he held numerous other leadership positions during nearly 32 years with Michelin in the United States, France and Scotland. He is past Chairman of the Executive Committee of the South Carolina Chamber of Commerce, former Director of the Yellowstone Park Foundation, and has served on the Clemson University President's Advisory Board and the University of South Carolina National Advisory Council. Very active in the Greenville community, Mr. Wilkerson served as 2012 Chairman of the United Way of Greenville County Board of Trustees and serves as Vice Chair on the Board of Directors for the Community Foundation of Greenville. He is a member of the Board of Directors of the Greenville Health System, the South Carolina Association of Independent Colleges and Universities, and the Institute for Child Success.

Mr. Howard offers a distinguished record of business and economic development accomplishments, having served from 1992-2008 as President and CEO of the South Carolina Chamber of Commerce. Prior to his work with the Chamber, Mr. Howard served as Chairman of the South Carolina Tax Commission from 1986-1992, and as Special Assistant to the Deputy Commissioner of the IRS. He also served from 1974-1982 as a member of the South Carolina House of Representatives, and is a graduate of the University of South Carolina and a certified public accountant, currently serving as an advisor to Scott and Company Certified Public Accountants. He is a member of the South Carolina Association of Certified Public Accountants, serves on the Board of Directors of the South Carolina Higher Education Foundation, and chairs the Board of the Greenville Technical College Foundation.

Mr. Franklin is the Chief Operations Officer for Bob Jones University following a distinguished 24-year career with Ernst & Young, an international accounting and consulting firm, where he served both domestic and international clients from offices in France, England, and the Southeastern United States. Mr. Franklin holds a B.S. in Professional Accounting from Bob Jones University, and is widely recognized as a strong consensus builder who is keenly aware of international business issues and opportunities, having conducted business in 37 countries. He is a member of the Board of Directors of Pinnacle Bank of South Carolina in Greenville and of The Wilds, a Christian camp located in Brevard, N.C.

Dr. Tom Quantrille is President and CEO of Advanced Composite Materials, LLC, a Greer-based specialty materials manufacturer that he joined in 2002. Previously, Dr. Quantrille was with BBA Group, plc, where he held numerous positions in research and development, sales management, marketing, and business development. He also worked with The Procter & Gamble Company. He holds a B.S. and a Ph.D. in Chemical Engineering from Virginia Tech, is a published author, and holds numerous patents pertaining to advanced materials technologies, primarily in the fields of composites, ceramics, and polymers. He is active in both educational and workforce development efforts in Greenville County and at Heritage Bible Church.

"Greenville County has benefited significantly from the insights and efforts of these four community leaders, and we are excited to have them lead our Board in the coming year," said Kevin Landmesser, Interim GADC President and CEO. "They have been active contributors to economic development initiatives for years and are well-versed in the needs and challenges facing the community. Their acceptance of these important roles provides critical experience, stability and insight to the GADC's and Greenville County's efforts."

Mr. Landmesser also expressed appreciation to outgoing Chairman Bob Howard, outgoing Treasurer Scott Case, outgoing Secretary Ray Lattimore, and former Chairperson Jo Watson Hackl for their years of dedicated service on the Board and to the community. "All of these individuals have played a major role in moving Greenville's economic development agenda forward, and for that our county's citizens are extremely grateful," he said.

CORONER: 'NO EVIDENCE' SHOOTING VICTIM WAS IN CAR

## FAMILY LOOKS FOR ANSWERS

### Investigation into incident continues

By Lyn Riddle

Staff writer lnriddle@greenvillenews.com

It was over in a matter of minutes, seconds really. One man dead, another who will live with it for the rest of his life.

The man who died was a 22-year-old father of two sons with another due next month. He worked at Hardee's.

The other was a Greenville County sheriff's deputy whose name won't be released until an internal investigation is completed, probably next week. Sheriff Steve Loftis said the deputy had never been involved in a shooting before.

The shooting has raised questions about the use of deadly force by law enforcement, the training officers receive

See SHOOTING, Page 4A

"

### *My prayers and thoughts are with the family. It's a very unfortunate situation."*

SHERIFF STEVE LOFTIS



FAMILY LOOKS

## Article Continued Below

See SHOOTING on Page A04

**SHOOTING**

Continued from Page 1A

and whether the action was justified. It turned out Jordan Browder had no weapon.

"Are they trained to shoot first?" Browder's stepfather, James Howard said, as he stood outside his home in the midday heat two days after the shooting.

Sheriff Steve Loftis said, "My prayers and thoughts are with the family. It's a very unfortunate situation. All this suspect needed to do was follow the commands of the officer."

The shooting took place as Monday began, about the time Browder had been scheduled to begin his shift at the Hardee's on S.C. 86.

Instead, he and a friend, Dylan Tiller, were sleeping in a Ford Expedition outside the 24-hour Citgo station on Piedmont Highway, one Browder's mother frequented since it was close to home. Browder was living at the family's home, too, with his stepfather, wife and one of his sons, a blond toddler.

The day shift supervisor called 911 at 6:24 a.m. to say a Ford Expedition had been parked by a pump for two hours. Fifteen minutes later, the first deputy arrived, the dispatch record shows. Loftis said the deputy walked to the driver's side door, saw the occupants asleep and noticed a handgun in the driver's lap. He called for backup. Within about 10 minutes five other deputies arrived.

"When someone says gun, everybody responds," Loftis said.

The officers positioned themselves around the car and called out, "Sheriff's Office. Open the door. Come out with your hands up." Browder, the passenger, opened the door and stepped out of the vehicle, Loftis said. Browder had his hand in his waistband, then his pocket. He walked toward the deputy, who fired three times from a distance of five or six feet, Loftis said.

Browder was hit once in the shoulder, once in the chest, his stepfather was told by the Coroner's Office.

Then the driver, Tiller, 21, stepped out of the car with his hands up, Loftis said.

He was found to have a pistol and a screwdriver as well as the pistol in the vehicle, authorities said. Tiller was arrested and charged with unlawful carrying of a pistol, manufacturing and distribution of methamphetamine and financial transaction card theft, according to arrest warrants.

Wednesday night, Tiller, of Dryden Avenue in Piedmont, remained in the Greenville County Detention Center. Bond was set at $40,000. Greenville County Coroner Parks Evans told *The Greenville News* on Tuesday that he was investigating whether Browder was inside or outside his car when he was shot.

On Wednesday, Evans said, "At this time, we have no evidence that indicates that Jordan Browder was inside the vehicle when his injuries occurred."

Loftis said Wednesday, "He was out of the car. The deputy did not walk up to the car and shoot him."

Loftis said investigators are reviewing video from the dashboard cameras in the cars and surveillance video from the gas station. They want to see what happened as well as identify any witnesses.

Howard, Browder's stepfather said he is angry, hurt and wants answers. The family is looking to hire an attorney to bring a wrongful death action against the department and the deputy.

"If this was a mistake or a wrongful shooting, I will do everything in my power to make sure this police officer is punished," Howard said.

He said his stepson was 5-feet-6 and weighed 125 pounds and could easily have been subdued by officers, especially more than one. He also said he believes his stepson would have run before he would have lunged at officers.

He also wonders why the deputies didn't release the K-9s who were on the scene, rather than shooting.

"Why was he not tazed," Howard said. Browder was convicted in 2009 in Greenville County of a first-offense drug charge. Howard, who served eight years in the Marines and works at GE, said he raised Browder from the time he was 6.

Browder attended Southside High School but dropped out before graduating, Howard said. He has a 4-year-old son who lives in Tennessee with his mother. "When Jordan was himself, he was one of the best dads I've ever seen," Howard said. His message to others is, "Parents, don't let your kids hang out. Or get ready to bury them."

Loftis said an internal investigation is underway. The results will be given to a three-member panel of ranking officers who will determine whether the officer followed the use of force policy. Officers are trained to consider whether someone has the ability to harm them or others, the opportunity and whether someone's life is truly in jeopardy. The decision must be made in seconds, instructors at the Criminal Justice Academy told The Greenville News last year.

They also are taught to manage the extreme physical reactions they are having in such situations, but if they determine the threat is real, their job is to shoot to kill.

The State Law Enforcement Division is also investigating Monday's shooting. Its report will be turned over to 13 th Circuit Solicitor Walt Wilkins, who will determine if criminal charges should be pursued. That process is followed whenever an officer uses deadly force.

No Greenville County deputy has been charged with a crime in connection with a shooting.

Last year deputies were involved in one officer- involved shooting, and so far this year there has been one other.

On Feb 2, an officer was called to a domestic disturbance on Scruggs Circle. As he walked into the house a man pointed a gun at him and the officer fired, authorities said. The man survived and was charged with attempted murder, pointing a firearm and possession of a gun during the commission of a violent crime. He's being held in the LEC with no bond.



**Dylan Lamar Tiller**

/GREENVILLE COUNTY SHERIFF'S OFFICE

**RELATED ARTICLES:**

- TIMELINE

Powered by TECNAVIA                    *Copyright (c) 2014 The Greenville News 06/05/2014*

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

In re:

Union Hospital District,

Debtor.

Case No.
Chapter 9

**DECLARATION OF PAUL R. NEWHOUSE**

I, the undersigned Paul R. Newhouse, being duly sworn, depose and state on oath as follows:

1.      I am the Chief Executive Officer ("CEO") of Union Hospital District ("Debtor"). In my capacity as CEO, I am personally familiar with the operations of the Debtor and its financial condition.

2.      Within the corporate umbrella of the Debtor are four distinct areas of services and operations:

> (i)      Wallace Thomson Hospital ("Hospital");
>
> (ii)     Ellen Sagar Nursing Homes ("Ellen Sagar");
>
> (iii)    Carolinas Health Associates ("Carolinas Health"); and
>
> (iv)     Union County EMS ("EMS").

3.      The Hospital is the general community hospital for Union County, South Carolina and represents the initial entry point for area residents to various levels of the health care system. The Hospital is a public 143-bed acute-care facility. The Hospital offers the normal range of services for a rural community hospital, including medical, surgical, emergency, and OB services. The Hospital is serviced by a staff of 7 primary care physicians, 2 general surgeons, 2 pediatricians, 3 OBGYN practitioners, 1 pathologist, 1 radiologist, 1 anesthesiologist, and 3 hospitalists. Carolinas Health is the network of physicians that are employed by the Debtor EMS

1

EXHIBIT
**3**

is the Union County Emergency Services operations, which is managed by the Debtor pursuant to a management contract with Union County.

4.    For financial reporting purposes, the Debtor maintains separate records of income and expenses for each of its four service areas, but also consolidates the financial results into a consolidated financial statement. Attached hereto as Exhibit 1 are the key financial reports for the period ending March 31, 2014, including some comparison information to the preceding fiscal year. For the fiscal period October 1, 2013 to March 31, 2014, the Debtor showed a negative Net Assets of $557,263 and negative Operating Revenues of $3,576,965, on a consolidated basis.

3.    Following are the primary officers of the Hospital:

    (a)    Board of Directors

        (i)     Rhonda Ingle-Chairman        Voting

        (ii)    Jeff Cannon        Voting

        (iii)   Shirley Gist        Voting

        (iv)   Brent Greet – Vice Chairman        Voting

        (v)    Bobbie Jean Lawson – Secretary-Treasurer  Voting

        (vi)   Lynn Lawson        Voting

        (vii)  Karen Newton        Voting

        (viii) M. John Flood, MD        Non-Voting

        (ix)   Natashia Jeter, MD        Non-Voting

        (x)    Daniel Crow, MC        Non-Voting

    (b)    Operating Officers

        Paul Newhouse – Chief Executive Officer

        Cindy Gault – Chief Financial Officer

and ordinary course of business unsecured trade debt.  For reporting purposes, the Debtor maintains separate records of income and expenses for each of its service areas, but also consolidates the financial results into a consolidated financial statement.  Attached hereto as Exhibit 1 are the key financial reports for the period ending March 31, 2014, including some comparison information to the preceding fiscal year.  For the fiscal period October 1, 2013 to March 31, 2014, the Debtor showed a negative Net Assets of $557,263 and negative Operating Revenues of $3,576,965, on a consolidated basis.

6.    The Debtor has struggled to pay its debts in the ordinary course of business and therefore has accrued significant trade debt that it is currently not able to pay.  Moreover, the Debtor is currently the defendant in various civil actions related to the collection of outstanding trade debt in the amount of approximately $5,600,000.00.  Debtor does not currently have the ability to pay such obligations and expects judgments to be entered in the cases in favor of one or more of the plaintiffs.  On June 4, 2014, Morrison Management Specialist, Inc. proceeded with the filing of a Confession of Judgment against the Debtor in Spartanburg County.  Cardinal Health 200, LLC has already obtained a judgment against the Debtor in Ohio and on May 29, 2014 served Debtor via certified mail a Notice of Filing Foreign Judgment.  Also, Aramark Management Services Limited Partnership informed Debtor on June 2, 2014, that is intended to proceed with filing a stipulation of judgment in Pennsylvania unless the Debtor represented by June 5, 2014 that it could represent that it could make a payment of $3,286,324.53 on or before June 30, 2014.  Debtor determined that it could not make the requested representation or payment.

7. Debtor desires to effectuate a plan of adjustment with its creditors, but has concluded that it currently needs the protection for the Unites States Bankruptcy Court in order for those

3

that it currently needs the protection for the Unites States Bankruptcy Court in order for those

efforts to proceed in an efficient, fair and orderly manner.

      7.      The Debtor does not have any outstanding bonds.

WITNESS my hand this _5th_ day of _June_, 2014, at _Union_____, South

Carolina.

_____
Paul R. Newhouse

Sworn to and subscribed before me this _5th_ day
of _June_____ 2014.

_Xou Ellen T Speer_____
Notary Public, State of South Carolina
My commission expires _Oct 19, 2015_.

**Union Hospital District**

# FINANCIAL STATEMENTS
# FOR THE MONTH ENDED
# MARCH 31, 2014
# (UNAUDITED)

EXHIBIT

tables

1

# UNION HOSPITAL DISTRICT
# FINANCIAL STATEMENTS INDEX
# FOR THE MONTH ENDED MARCH 31, 2014

Page(s)

Financial Report - Union Hospital District

| | |
|---|---|
| Financial Highlights | 1-3 |
| Comparative Statistical Information | 4 |
| Key Indicators | 5 |
| Comparative Balance Sheets | 6 |
| Comparative Statements of Operations | 7 |
| Supplementary Information: | |
| Combining Divisional Balance Sheets | 8 |
| Combining Divisional Statements of Operations - Current Month Actual | 9 |
| Combining Divisional Statements of Operations - Year-To-Date Actual | 10 |

UNION HOSPITAL DISTRICT
CONSOLIDATED STATISTICS
FOR THE MONTH AND YEAR-TO-DATE ENDED MARCH 31, 2014

| CURRENT MONTH | | | | | | YEAR-TO-DATE | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| PRIOR YEAR | ACTUAL | BUDGET | VARIANCE FAVOR (UNFAVOR) | % VARIANCE FAVOR (UNFAVOR) | | | PRIOR YEAR | ACTUAL | BUDGET | VARIANCE FAVOR (UNFAVOR) | % VARIANCE FAVOR (UNFAVOR) |

**HOSPITAL STATISTICS**

| PRIOR YEAR | ACTUAL | BUDGET | VAR F/(U) | % VAR | | PRIOR YEAR | ACTUAL | BUDGET | VAR F/(U) | % VAR |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **DISCHARGES/ DELIVERIES** | | | | | |
| 181 | 161 | 272 | (111) | | (41) Adult & Pediatric | 1,134 | 964 | 1,439 | (475) | (33) |
| 10 | 9 | 11 | (2) | | (18) Newborn Deliveries | 58 | 66 | 47 | 19 | 40 |
| 191 | 170 | 283 | (113) | | (40) Total | 1,192 | 1,030 | 1,486 | (456) | (31) |
| | | | | | **DAYS OF CARE** | | | | | |
| 787 | 520 | 1,082 | (562) | | (52) Adult & Pediatric | 4,962 | 3,981 | 5,738 | (1,757) | (31) |
| 86 | 47 | 50 | (3) | | (6) Observation | 384 | 422 | 290 | 132 | 46 |
| 25 | 19 | 22 | (3) | | (14) Newborn | 139 | 141 | 94 | 47 | 50 |
| 898 | 586 | 1,154 | (568) | | (49) Total | 5,485 | 4,544 | 6,122 | (1,578) | (26) |
| | | | | | **AVERAGE DAILY CENSUS** | | | | | |
| 25.39 | 16.77 | 34.90 | (18.1) | | (52) Adult & Pediatric | 27.26 | 21.87 | 31.53 | (9.7) | (31) |
| 2.77 | 1.52 | 1.61 | (0.1) | | (6) Observations | 2.11 | 2.32 | 1.59 | 0.7 | 46 |
| 0.81 | 0.61 | 0.71 | (0.1) | | (14) Newborn | 0.76 | 0.77 | 0.52 | 0.3 | 50 |
| 28.97 | 18.90 | 37.23 | (18) | | (49) Total | 30.14 | 24.97 | 33.64 | (9) | (26) |
| | | | | | **AVERAGE LENGTH OF STAY** | | | | | |
| 4.16 | 3.34 | 4.00 | 0.7 | | 17 Adult & Pediatric | 4.25 | 4.13 | 4.00 | (0.1) | (3) |
| 1.62 | 1.62 | 1.19 | (0.4) | | (36) Observation | 1.27 | 1.75 | 1.14 | (0.6) | (54) |
| 2.50 | 2.11 | 2.00 | (0.1) | | (5) Newborn | 2.40 | 2.14 | 2.00 | (0.1) | (7) |
| | | | | | **EMERGENCY DEPARTMENT** | | | | | |
| 1,609 | 1,518 | 1,600 | (82) | | (5) Total ED Visits | 10,372 | 9,684 | 9,595 | 89 | 1 |
| 7.9% | 8.0% | 8.0% | (0.0) | | (0) ED Admits as % of Total Visits | 8.5% | 8.0% | 8.0% | 0.0 | 0 |
| 76.3% | 77.6% | 59.0% | 18.6% | | 31 ED Admits as % of Total Admits | 74.7% | 79.7% | 59.0% | 20.7% | 35 |
| | | | | | **SURGICAL SERVICES** | | | | | |
| 32 | 18 | 38 | (20) | | (53) OR -Inpatient Cases | 207 | 145 | 224 | (79) | (35) |
| 42 | 34 | 61 | (27) | | (44) OR -Outpatient Cases | 325 | 183 | 353 | (170) | (48) |
| 26 | 20 | 37 | (17) | | (46) Endoscopy -Inpatient Cases | 156 | 144 | 224 | (80) | (36) |
| 40 | 38 | 43 | (5) | | (12) Endoscopy -Outpatient Cases | 249 | 214 | 259 | (45) | (17) |
| 67 | 53 | 80 | (27) | | (34) Other OR -Outpatient Cases | 359 | 305 | 413 | (108) | (26) |
| 207 | 163 | 259 | (96) | | (37) Total | 1,296 | 991 | 1,473 | (482) | (33) |
| | | | | | **OUTPATIENT** | | | | | |
| 1,079 | 690 | 1,390 | (700) | | (50) Outpatient Visits | 6,247 | 4,115 | 8,070 | (3,955) | (49) |
| 442 | 406 | 515 | (109) | | (21) Adjusted Discharges | 2,680 | 2,245 | 2,949 | (704) | (24) |
| 1,920 | 1,311 | 2,053 | (742) | | (36) Adjusted Patient Days | 11,371 | 9,208 | 11,751 | (2,543) | (22) |
| | | | | | **PRODUCTIVITY** | | | | | |
| 231.3 | 244.5 | 230.0 | (14.5) | | (6) Employed FTEs | 230.3 | 239.4 | 230.0 | (9.4) | (4) |
| 8.5 | 6.1 | 8.0 | 1.9 | | 23 Overtime FTEs | 7.9 | 6.6 | 8.0 | 1.4 | 16 |
| 40.4 | 1.7 | 45.6 | 43.9 | | 96 Contract FTEs | 40.7 | 4.8 | 45.6 | 40.8 | 89 |
| 271.7 | 246.2 | 275.6 | 29.4 | | 11 Total Hospital FTEs | 271.0 | 244.2 | 275.6 | 31.4 | 11 |
| 3.7 | 2.5 | 3.5 | 1.0 | | 28 Overtime Utilization % | 3.4 | 2.7 | 3.5 | 0.7 | 21 |
| 4.4 | 5.8 | 4.2 | (1.7) | | (40) FTEs Per Adjusted Occupied Bed | 3.6 | 4.8 | 4.3 | (0.6) | (13) |
| 0.61 | 0.61 | 0.54 | (0.07) | | (13) FTEs Per Adjusted Discharge | 0.51 | 0.65 | 0.56 | (0.09) | (16) |
| 529.4 | 508.9 | 524.0 | 15.1 | | 3 Total Enterprise FTEs (Paid) | 522.60 | 491.00 | 524.00 | 33.0 | 6 |
| 1.0451 | 0.9483 | 1.0100 | (0.0617) | | (6) HOSPITAL CASE-MIX INDEX | 1.0249 | 1.0186 | 1.0100 | 0.0086 | 1 |
| | | | | | **HOSPITAL PAYOR MIX** | | | | | |
| 49.3% | 49.6% | 51.8% | 2.2 | | 4 Medicare | 51.8% | 52.7% | 51.8% | (0.9) | (2) |
| 14.9% | 15.5% | 13.7% | (1.8) | | (13) Medicaid | 13.7% | 14.8% | 13.7% | (1.1) | (8) |
| 13.6% | 10.2% | 11.4% | 1.2 | | 11 Blue Cross and Blue Shield | 11.4% | 10.6% | 11.4% | 0.8 | 7 |
| 8.8% | 8.0% | 7.6% | (0.4) | | (6) Managed Care/Commercial | 7.6% | 7.4% | 7.6% | 0.2 | 3 |
| 13.4% | 16.7% | 15.6% | (1.1) | | (7) Self-pay and Other | 15.6% | 14.5% | 15.6% | 1.1 | 7 |
| 100.0% | 100.0% | 100.0% | (0.0) | | Total | 100.0% | 100.0% | 100.0% | 3.0 | |

**LONG-TERM CARE**

| 106.0 | 101.2 | 109.8 | (9) | | (8) Average Daily Census | 106.3 | 102.1 | 109.8 | (8) | (7) |
|---|---|---|---|---|---|---|---|---|---|---|
| 105.8 | 104.3 | 108.0 | 4 | | 3 Total FTEs | 102.6 | 101.2 | 108.0 | 7 | 6 |

**EMERGENCY MEDICAL SERVICES**

| 589 | 524 | 535 | (11) | | (2) Total Emergency and Transport Runs | 3,545 | 3,826 | 3,270 | 356 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| 37.5 | 37.0 | 36.0 | 1 | | 3 Total FTEs | 36.4 | 37.0 | 36.0 | 1 | 3 |

**PHYSICIAN NETWORKS**

| 5,130 | 4,129 | 5,642 | (1,513) | | (27) Total Provider Visits | 28,813 | 24,506 | 32,235 | (7,729) | (24) |
|---|---|---|---|---|---|---|---|---|---|---|
| 18.0 | 18.0 | 18.0 | 0.0 | | 0 Provider FTEs | 18.0 | 18.0 | 18.0 | 0.0 | 0 |
| 13.6 | 10.9 | 14.9 | (4.0) | | (27) Visits per Day per Provider FTE | 12.6 | 11.1 | 14.1 | (3.0) | (22) |
| 67.6 | 71.3 | 58.6 | 12.7 | | 22 Total Staff FTEs | 63.8 | 59.8 | 58.6 | 1.2 | 2 |

-4-

# UNION HOSPITAL DISTRICT
## KEY INDICATORS
### YEAR-TO-DATE ENDED MARCH 31, 2014

| | 2009 S & P "BBB" MEDIAN | ACTUAL | TARGET | VARIANCE FAVOR (UNFAVOR) | % VARIANCE FAVOR (UNFAVOR) |
|---|---|---|---|---|---|
| [1]Operating Margin % | 2.3% | -17.0% | -1.3% | -15.7% | -1207.7% |
| [1]Operating Cash Flow Margin % | 9.5% | -9.5% | 3.3% | -12.8% | -387.8% |
| Total Margin % | 2.3% | -14.6% | 0.0% | -14.6% | 731400.0% |
| Hospital Adjusted Discharge Growth Rate | n/a | -16.0% | 8.0% | -24.0% | -300.0% |
| [1]Days Unrestricted Cash on Hand | 125 | 0.3 | 40 | -40 | -99.2% |
| [1]Unrestricted Cash as % of Long-Term Debt | 88.2% | 0.5% | 84.0% | -83.5% | -99.4% |
| Net Days of Hospital Revenue in Total Hospital Patient Accounts Receivable | 45 | 90 | 50 | -40 | -80.0% |
| Gross Days of Hospital Revenue in DNFB Hospital Patient Accounts Receivable | n/a | 4 | 5 | 1 | 20.0% |
| Net Days of Revenue in Freestanding Long-Term Care Facility Patient Accounts | n/a | 81 | 38 | -43 | -113.2% |
| Net Days of Revenue in EMS Patient Accounts Receivable | n/a | 19 | 17 | -2 | -11.8% |
| Net Days of Revenue in Physician Practices Patient Accounts Receivable | n/a | 23 | 45 | 22 | 48.9% |
| Salaries / Benefits/Contract Labor as % of Total Net Patient Revenue | 49.0% | 72.7% | 66.9% | -5.84% | -8.7% |
| [2]Net Charity Care as % of Gross Patient Revenue | n/a | 3.5% | 1.4% | -2.10% | -150.0% |
| Net Bad Debts as % of Gross Patient Revenue | n/a | 4.7% | 6.9% | 2.22% | 32.2% |
| Net Bad Debts/Charity Care/Uninsured Disc. as % of Gross Patient Revenue | n/a | 10.0% | 10.5% | 0.49% | 4.7% |
| [1]Maximum Annual Debt Service Coverage(x) | 3.0 | (0.4) | 1.5 | -1.9 | -129.3% |
| Capital Expenditures as % of Depreciation and Amortization | 112.6% | 12.0% | 125.0% | -113.00% | -90.4% |

[1]Identified by rating agencies as a key ratio in determining ratings for hospitals and healthcare systems.

[2]Average from 2005 Charity Care Survey by PricewaterhouseCoopers (not an S & P Median).

**UNION HOSPITAL DISTRICT**
**COMPARATIVE BALANCE SHEETS**
**MARCH 31, 2014 AND SEPTEMBER 30, 2013**

| | 3/31/2014 | 9/30/2013 | $<br>Increase<br>(Decrease) | %<br>Increase<br>(Decrease) |
|---|---|---|---|---|
| **ASSETS** | | | | |
| | | | | |
| **CURRENT ASSETS** | | | | |
| Cash and cash equivalents | $24,599 | $328,329 | ($303,730) | -93% |
| Patient accounts receivable - net | 7,239,667 | 8,267,580 | (1,027,913) | -12% |
| Estimated third party receivable | 355,137 | 536,935 | (181,798) | 0% |
| Other accounts receivable | 597,592 | (13,084) | 610,676 | -4667% |
| Inventories | 1,047,695 | 1,032,263 | 15,432 | 1% |
| Prepaid expenses | 353,307 | 270,538 | 82,769 | 31% |
| | | | | |
| Total Current Assets | 9,617,997 | 10,422,561 | (804,564) | -8% |
| | | | | |
| PROPERTY, PLANT, AND EQUIPMENT | 54,855,649 | 54,699,298 | $156,351 | 0% |
| Less accumulated depreciation | (40,637,971) | (39,297,780) | ($1,340,191) | 3% |
| | | | | |
| Total Property, Plant and Equipment, Net | 14,217,678 | 15,401,518 | (1,183,840) | -7.7% |
| | | | | |
| OTHER ASSETS | | | | |
| Assets limited as to use: | | | | |
| Designated as funded depreciation - hospital | 18,220 | 318,360 | (300,140) | -94% |
| Designated as funded depreciation - nursing home | 0 | 0 | 0 | 0% |
| Designated as funded depreciation - EMS | 0 | 0 | 0 | 0% |
| Restricted - Cash Collateral Account (Principal) | 250,196 | 250,159 | 37 | 0% |
| Restricted - Cash Collateral Account (Interest) | 0 | 0 | 0 | 0% |
| Restricted - Funds Held for Others | 0 | 0 | 0 | 0% |
| Other accounts receivable | 0 | 0 | 0 | 0% |
| Bond issue costs - net | 0 | 0 | 0 | 0% |
| Other assets | 0 | 0 | 0 | 0% |
| Total Other Assets | 268,416 | 568,519 | (300,103) | -53% |
| | | | | |
| TOTAL ASSETS | $24,104,091 | $26,392,598 | ($2,288,507) | -9% |
| | | | | |
| **LIABILITIES AND NET ASSETS** | | | | |
| **CURRENT LIABILITIES** | | | | |
| Accounts payable | $8,458,402 | $8,349,935 | $108,467 | 1% |
| Salaries and benefits payable | 1,280,495 | 1,196,826 | 83,669 | 7% |
| Other liabilities and accruals | 4,351,706 | 3,400,415 | 951,291 | 28% |
| Estimated third party reserves | 2,009,141 | 1,659,223 | 349,918 | 21% |
| Current portion of long-term debt | 73,268 | 168,490 | (95,222) | -57% |
| Union County Bonds | 2,875,000 | 2,825,000 | 50,000 | 0% |
| | | | | |
| Total Current Liabilities | 19,048,012 | 17,599,889 | 1,448,123 | 8% |
| | | | | |
| LONG TERM LIABILITIES | | | | |
| LONG TERM DEBT, less current portion | 5,613,701 | 6,207,605 | (593,904) | -10% |
| Deferred revenue | 0 | 0 | 0 | 100% |
| Other long-term liabilities | 0 | 0 | 0 | 0% |
| | | | | |
| TOTAL LIABILITIES | 24,661,713 | 23,807,494 | 854,219 | 4% |
| | | | | |
| NET ASSETS | | | | |
| Invested in capital assets, net of debt | 8,996,331 | 8,996,331 | 0 | 0% |
| Unrestricted | (6,411,216) | 2,352,664 | (8,763,880) | -373% |
| Year - to - date results | (3,142,738) | (8,763,891) | 5,621,154 | 64% |
| Donations/transfers/other | 0 | 0 | 0 | 0% |
| | | | | |
| Total Net Assets | (557,623) | 2,585,104 | (3,142,727) | -122% |
| | | | | |
| TOTAL LIABILITIES AND NET ASSETS | $24,104,091 | $26,392,598 | ($2,288,508) | -9% |

**COMPARATIVE STATEMENTS OF OPERATIONS**
**FOR THE MONTH AND YEAR-TO-DATE ENDED MARCH 31, 2014**

| CURRENT MONTH | | | | | | YEAR-TO-DATE | | | | |
| PRIOR YEAR | ACTUAL | BUDGET | $ VARIANCE FAVOR (UNFAVOR) | % VARIANCE FAVOR (UNFAVOR) | | PRIOR YEAR | ACTUAL | BUDGET | $ VARIANCE FAVOR (UNFAVOR) | % VARIANCE FAVOR (UNFAVOR) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Gross Patient Revenue** | | | | | |
| $3,784,590 | $2,720,838 | $5,593,423 | ($2,872,585) | (51) | Inpatient | $23,166,201 | $20,759,275 | $29,073,911 | ($8,314,635) | (29) |
| 2,503,304 | 2,015,197 | 1,920,000 | 95,197 | 5 | Emergency | 13,964,388 | 13,443,871 | 11,685,000 | 1,758,871 | 15 |
| 412,141 | 221,153 | 355,000 | (133,847) | (38) | Observation | 2,130,469 | 2,047,735 | 2,039,500 | 8,235 | 0 |
| 2,474,961 | 1,904,914 | 2,745,250 | (840,336) | (31) | Outpatient | 15,155,321 | 11,729,209 | 16,444,500 | (4,715,291) | (29) |
| 569,688 | 611,006 | 674,396 | (63,390) | (9) | Skilled Nursing/Long-term Care | 3,378,074 | 3,616,867 | 4,008,749 | (391,882) | (10) |
| 318,102 | 262,379 | 287,830 | (25,451) | (9) | EMS | 1,895,656 | 1,892,758 | 1,759,260 | 133,498 | 8 |
| 955,306 | 741,350 | 1,348,438 | (607,088) | (45) | Physician Offices | 8,138,466 | 4,712,030 | 7,704,165 | (2,992,136) | (39) |
| 11,018,092 | 8,476,837 | 12,924,337 | (4,447,500) | (34) | Total Patient Revenue | 65,828,575 | 58,201,745 | 72,715,085 | (14,513,340) | (20) |
| | | | | | **Revenue Deductions** | | | | | |
| 3,420,260 | 2,945,631 | 4,241,962 | 1,296,331 | 31 | Medicare | 20,784,845 | 21,341,586 | 23,717,446 | 2,375,860 | 10 |
| 784,951 | 1,396,947 | 1,092,428 | (304,519) | (28) | Medicaid | 6,545,244 | 6,173,750 | 6,082,577 | (91,173) | (1) |
| 731,878 | 539,735 | 823,813 | 284,079 | 34 | Managed Care/Commercial | 4,590,746 | 3,720,664 | 4,544,952 | 824,288 | 18 |
| 204,404 | 365,929 | 191,046 | (174,883) | (92) | Charity Care | 1,939,027 | 2,034,200 | 1,057,013 | (977,186) | (92) |
| 942,727 | 1,001,316 | 1,089,646 | 88,329 | 8 | Other | 6,173,979 | 5,177,789 | 6,361,806 | 1,184,017 | 19 |
| 1,228,080 | -757,671 | 889,100 | 1,646,771 | 185 | Provision for Uncollectibles-Net | 4,527,732 | 2,633,575 | 5,003,860 | 2,370,285 | 47 |
| 7,312,299 | 5,491,887 | 8,327,995 | 2,836,108 | 34 | Total Revenue Deductions | 44,561,574 | 41,081,564 | 46,767,654 | 5,686,090 | 12 |
| 3,705,793 | 2,984,950 | 4,596,342 | (1,611,392) | (35) | **Net Patient Revenue** | 21,267,001 | 17,120,181 | 25,947,431 | (8,827,250) | (34) |
| 335,061 | 927,108 | 179,708 | 747,400 | 416 | Other Operating Revenue | 3,251,716 | 3,925,643 | 1,078,253 | 2,847,390 | 264 |
| 4,040,854 | 3,912,058 | 4,776,050 | (863,992) | (18) | **Net Operating Revenue** | 24,518,717 | 21,045,823 | 27,025,684 | (5,979,861) | (22) |
| | | | | | **Operating Expense** | | | | | |
| 2,057,803 | 1,920,720 | 2,136,948 | 216,227 | 10 | Salaries & Wages | 11,668,408 | 11,125,610 | 12,281,577 | 1,155,967 | 9 |
| 473,939 | 579,117 | 554,480 | (24,637) | (4) | Fringe Benefits | 3,025,226 | 3,591,520 | 3,177,654 | (413,866) | (13) |
| 435,802 | 59,217 | 331,312 | 272,095 | 82 | Contract Labor | 2,487,708 | 591,878 | 1,893,532 | 1,301,654 | 69 |
| 197,056 | 357,333 | 200,233 | (157,100) | (78) | Professional Fees | 1,447,966 | 1,872,938 | 1,266,801 | (606,137) | (48) |
| 264,811 | 272,533 | 367,390 | 94,857 | 26 | Purchased Services | 1,723,147 | 1,554,929 | 2,082,956 | 508,027 | 25 |
| 118,419 | 47,771 | 74,615 | 26,844 | 36 | Insurance | 473,241 | 279,656 | 419,959 | 140,304 | 33 |
| 106,565 | 110,366 | 123,226 | 12,860 | 10 | Utilities | 674,438 | 674,507 | 682,024 | 7,517 | 1 |
| 284,214 | 349,472 | 548,355 | 198,883 | 36 | Supplies | 2,421,350 | 2,304,128 | 3,151,304 | 847,175 | 27 |
| 181,222 | 169,562 | 201,450 | 31,887 | 16 | Other | 1,207,369 | 1,043,389 | 1,199,659 | 156,170 | 13 |
| 43,184 | 47,809 | 7,900 | (39,909) | (505) | Interest | 367,045 | 243,941 | 47,400 | (196,541) | (415) |
| 219,444 | 219,921 | 199,028 | (20,893) | (10) | Depreciation/Amortization | 1,327,858 | 1,340,192 | 1,194,168 | (146,025) | (12) |
| 4,382,459 | 4,133,822 | 4,744,937 | 611,115 | 13 | Total Operating Expense | 26,823,753 | 24,622,689 | 27,376,952 | 2,754,243 | 10 |
| (341,605) | (221,764) | 31,113 | (252,878) | (813) | INCOME FROM OPERATIONS | (2,305,036) | (3,576,865) | (351,248) | (3,225,618) | (918) |
| -8.45% | -5.67% | 0.65% | -6.32% | (970) | Operating Margin % | -9.40% | -17.00% | -1.30% | -15.70% | (1,206) |
| -1.95% | 1.17% | 4.98% | -3.81% | (76) | Operating Cash Flow % | -2.49% | -9.47% | 3.29% | -12.76% | (387) |
| | | | | | **Non-Operating Rev (Exp)** | | | | | |
| 54 | 94 | 80 | 14 | 17 | Interest and Dividend Income | 728 | 311 | 480 | (169) | (35) |
| | | | | | Not Inc (Dec) in Fair Value of Investments: | | | | | |
| 0 | 0 | 0 | 0 | | Realized Gains (Losses) | 0 | 0 | 0 | 0 | |
| -15 | (14) | 0 | (14) | 0 | Unrealized Gains (Losses) | 238 | (93) | 0 | (93) | 0 |
| 39 | 80 | 80 | (1) | (1) | Subtotal | 966 | 218 | 480 | (262) | (55) |
| 0 | 0 | 5,833 | (5,833) | 0 | Donations | 1,187 | 133,909 | 35,000 | 98,909 | 0 |
| 51,750 | 50,000 | 51,750 | (1,750) | (3) | Other | 310,500 | 300,000 | 310,500 | (10,500) | (3) |
| 51,789 | 50,080 | 57,663 | (7,584) | (13) | Total Non-Operating Rev (Exp) | 312,653 | 434,127 | 345,980 | 88,147 | 25 |
| ($289,816) | ($171,685) | $88,777 | (260,462) | (293) | Excess Revenue Over Expense | ($1,992,383) | ($3,142,738) | ($5,268) | (3,137,471) | 59,562 |
| -7.08% | -4.33% | 1.84% | -6.17% | -335.93% | Total Margin % | -8.02% | -14.63% | -0.02% | -14.61% | 75926.44% |

UNION HOSPITAL DISTRICT
COMBINING DIVISIONAL BALANCE SHEETS
MARCH 31, 2014

| | Wallace Thomson Hospital | Ellen Sagar Nursing Home | Union County EMS | Carolinas Health Associates | Subtotal | Inter-Divisional Eliminations | Total |
|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | |
| **CURRENT ASSETS** | | | | | | | |
| Cash and cash equivalents | -$360,913 | $308,629 | $75,098 | $1,785 | $24,599 | $0 | $24,599 |
| Patient accounts receivable - net | 5,485,319 | 1,391,229 | 85,463 | 277,656 | 7,239,667 | 0 | 7,239,667 |
| Estimated third party receivable | 0 | 355,137 | 0 | 0 | 355,137 | 0 | 355,137 |
| Interdivisional due from | 13,590,732 | 3,501,245 | 606,589 | 0 | 17,698,566 | (17,698,566) | 0 |
| Other accounts receivable | 567,592 | 0 | 30,000 | 0 | 597,592 | 0 | 597,592 |
| Inventories | 1,040,693 | 7,002 | 0 | 0 | 1,047,695 | 0 | 1,047,695 |
| Prepaid expenses | 293,671 | 36,858 | 12,239 | 10,539 | 353,307 | 0 | 353,307 |
| Total Current Assets | 20,817,094 | 5,600,100 | 809,389 | 289,980 | 27,316,563 | (17,698,566) | 9,617,997 |
| PROPERTY, PLANT, AND EQUIPMENT | 47,339,005 | 5,166,302 | 1,577,136 | 773,206 | 54,855,649 | 0 | 54,855,649 |
| Less accumulated depreciation | (35,320,528) | (3,548,365) | (1,404,728) | (364,350) | (40,637,971) | 0 | (40,637,971) |
| Total Property, Plant and Equipment, Net | 12,018,477 | 1,617,937 | 172,408 | 408,856 | 14,217,678 | 0 | 14,217,678 |
| **OTHER ASSETS** | | | | | | | |
| Assets limited as to use: | | | | | | | |
| Designated as funded depreciation - hospital | 18,220 | 0 | 0 | 0 | 18,220 | 0 | 18,220 |
| Designated as funded depreciation - nursing home | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Designated as funded depreciation - EMS | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Restricted - Cash Collateral Account (Principal) | 250,196 | 0 | 0 | 0 | 250,196 | 0 | 250,196 |
| Restricted - Cash Collateral Account (Interest) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Restricted - Funds Held for Others | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other accounts receivable | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bond issue costs - net | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other assets | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Other Assets | 268,416 | 0 | 0 | 0 | 268,416 | 0 | 268,416 |
| TOTAL ASSETS | $32,903,987 | $7,218,037 | $981,797 | $698,836 | $41,802,657 | ($17,698,566) | $24,104,091 |
| **LIABILITIES AND NET ASSETS** | | | | | | | |
| **CURRENT LIABILITIES** | | | | | | | |
| Accounts payable | $8,457,762 | ($1,625) | $2,265 | $0 | $8,458,402 | $0 | $8,458,402 |
| Salaries and benefits payable | 1,024,649 | 136,696 | 0 | 119,150 | 1,280,495 | 0 | 1,280,495 |
| Other liabilities and accruals | 3,309,830 | 564,273 | 163,413 | 314,190 | 4,351,706 | 0 | 4,351,706 |
| Interdivisional due to | 0 | 0 | 0 | 17,698,566 | 17,698,566 | (17,698,566) | 0 |
| Estimated third party reserves | 1,586,852 | 422,289 | 0 | 0 | 2,009,141 | 0 | 2,009,141 |
| Current portion of long-term debt | 73,268 | 0 | 0 | 0 | 73,268 | 0 | 73,268 |
| Union County Bonds | 2,875,000 | 0 | 0 | 0 | 2,875,000 | 0 | 2,875,000 |
| Total Current Liabilities | 17,327,361 | 1,121,633 | 165,678 | 18,131,906 | 36,746,578 | (17,698,566) | 19,048,012 |
| **LONG TERM LIABILITIES** | | | | | | | |
| LONG TERM DEBT, less current portion | 5,560,622 | 0 | 53,079 | 0 | 5,613,701 | 0 | 5,613,701 |
| Deferred revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other long-term liabilities | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL LIABILITIES | 22,887,983 | 1,121,633 | 218,757 | 18,131,906 | 42,360,279 | (17,698,566) | 24,661,713 |
| **NET ASSETS** | | | | | | | |
| Invested in capital assets, net of debt | 6,530,855 | 1,978,779 | 486,697 | 0 | 8,996,331 | 0 | 8,996,331 |
| Unrestricted | 3,565,408 | 4,754,309 | 723,835 | (15,454,768) | (6,411,216) | 0 | (6,411,216) |
| Year - to - date results | (1,663,259) | 363,316 | 135,508 | (1,978,302) | (3,142,738) | 0 | (3,142,738) |
| Donations/transfers/other | 1,583,000 | (1,000,000) | (583,000) | 0 | 0 | 0 | 0 |
| Total Net Assets | 10,016,004 | 6,096,404 | 763,040 | (17,433,070) | (557,623) | 0 | (557,623) |
| TOTAL LIABILITIES AND NET ASSETS | $32,903,987 | $7,218,037 | $981,797 | $698,836 | $41,802,657 | ($17,698,566) | $24,104,091 |

**UNION HOSPITAL DISTRICT**

**COMBINING DIVISIONAL STATEMENTS OF OPERATIONS - ACTUAL**

**FOR THE MONTH ENDED MARCH 31, 2014**

| | CURRENT MONTH ACTUAL | | | | | | |
|---|---|---|---|---|---|---|---|
| | Wallace Thomson Hospital | Ellen Sagar Nursing Home | Union County EMS | Carolinas Health Associates | Subtotal | Inter-Divisional Eliminations | Total |
| **Gross Patient Revenue** | | | | | | | |
| Inpatient | $2,720,838 | $0 | $0 | $0 | $2,720,838 | $0 | $2,720,838 |
| Emergency | 2,015,197 | 0 | 0 | 0 | 2,015,197 | 0 | $2,015,197 |
| Observation | 221,153 | 0 | 0 | 0 | 221,153 | 0 | $221,153 |
| Outpatient | 1,904,914 | 0 | 0 | 0 | 1,904,914 | 0 | $1,904,914 |
| Long-term Care | 0 | 611,006 | 0 | 0 | 611,006 | 0 | $611,006 |
| EMS | 0 | 0 | 262,379 | 0 | 262,379 | 0 | $262,379 |
| Physician Offices | 0 | 0 | 0 | 741,350 | 741,350 | 0 | $741,350 |
| Total Patient Revenue | 6,862,102 | 611,006 | 262,379 | 741,350 | 8,476,837 | 0 | $8,476,837 |
| **Revenue Deductions** | | | | | | | |
| Medicare | 2,872,540 | 4,919 | 68,172 | 0 | 2,945,631 | 0 | $2,945,631 |
| Medicaid | 1,347,703 | 26,860 | 22,384 | 0 | 1,396,947 | 0 | $1,396,947 |
| Managed Care/Commercial | 536,101 | 0 | 3,634 | 0 | 539,735 | 0 | $539,735 |
| Charity Care | 365,929 | 0 | 0 | 0 | 365,929 | 0 | $365,929 |
| Other | 519,578 | 0 | 256 | 481,482 | 1,001,316 | 0 | $1,001,316 |
| Provision for Uncollectibles-Net | (503,866) | 38,739 | 36,938 | (329,482) | (757,671) | 0 | ($757,671) |
| Total Revenue Deductions | 5,137,985 | 70,518 | 131,384 | 152,000 | 5,491,887 | 0 | $5,491,887 |
| **Net Patient Revenue** | 1,724,117 | 540,488 | 130,995 | 589,350 | 2,984,950 | 0 | $2,984,950 |
| Other Operating Revenue | 806,470 | 120,638 | 0 | 0 | 927,108 | 0 | $927,108 |
| Net Operating Revenue | 2,530,587 | 661,126 | 130,995 | 589,350 | 3,912,058 | 0 | $3,912,058 |
| **Operating Expense** | | | | | | | |
| Salaries & Wages | 1,101,318 | 272,151 | 99,274 | 447,977 | 1,920,720 | 0 | $1,920,720 |
| Fringe Benefits | 464,762 | 62,924 | 9,840 | 41,591 | 579,117 | 0 | $579,117 |
| Contract Labor | 43,518 | 13,100 | 2,599 | 0 | 59,217 | 0 | $59,217 |
| Professional Fees | 150,909 | 62,377 | 12,777 | 131,270 | 357,333 | 0 | $357,333 |
| Purchased Services | 214,086 | 18,902 | 27,710 | 11,835 | 272,533 | 0 | $272,533 |
| Insurance | 25,936 | 6,834 | 3,116 | 11,885 | 47,771 | 0 | $47,771 |
| Utilities | 75,062 | 15,961 | 9,796 | 9,547 | 110,366 | 0 | $110,366 |
| Supplies | 269,518 | 63,294 | 3,538 | 13,122 | 349,472 | 0 | $349,472 |
| Other | 98,189 | 54,981 | 1,726 | 14,666 | 169,562 | 0 | $169,562 |
| Interest | 47,809 | 0 | 0 | 0 | 47,809 | 0 | $47,809 |
| Depreciation/Amortization | 193,242 | 11,802 | 6,778 | 8,099 | 219,921 | 0 | $219,921 |
| Total Operating Expense | 2,684,350 | 582,326 | 177,154 | 689,993 | 4,133,822 | 0 | $4,133,822 |
| **INCOME FROM OPERATIONS** | (153,763) | 78,800 | (46,159) | (100,643) | (221,764) | 0 | ($221,764) |
| **Operating Margin %** | -6.08% | 11.92% | -35.24% | -17.08% | -5.67% | 0.00% | -5.67% |
| **Operating Cash Flow %** | 3.45% | 13.70% | -30.06% | -15.70% | 1.17% | 0.00% | 1.17% |
| **Non-Operating Rev (Exp)** | | | | | | | |
| Interest and Dividend Income | 94 | 0 | 0 | 0 | 94 | 0 | 94 |
| Net Inc (Dec) in Fair Value of Investments: | | | | | | | |
| Realized Gains (Losses) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Unrealized Gains (Losses) | (14) | 0 | 0 | 0 | (14) | 0 | (14) |
| Subtotal | 80 | 0 | 0 | 0 | 80 | 0 | 80 |
| Donations | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | 0 | 0 | 50,000 | 0 | 50,000 | 0 | 50,000 |
| Total Non-Operating Rev (Exp) | 80 | 0 | 50,000 | 0 | 50,080 | 0 | 50,080 |
| **Excess Revenue Over Expense** | (153,683) | 78,800 | 3,841 | (100,643) | (171,685) | 0 | (171,685) |
| **Total Margin %** | -6.07% | 11.92% | 2.12% | -17.08% | -4.33% | 0.00% | -4.33% |

## UNION HOSPITAL DISTRICT
### COMBINING DIVISIONAL STATEMENTS OF OPERATIONS - ACTUAL
### FOR THE YEAR-TO-DATE ENDED MARCH 31, 2014

| | Wallace Thomson Hospital | Ellen Sagar Nursing Home | Union County EMS | Carolinas Health Associates | Subtotal | Inter-Divisional Eliminations | Total |
|---|---|---|---|---|---|---|---|
| **YEAR-TO-DATE ACTUAL** | | | | | | | |
| **Gross Patient Revenue** | | | | | | | |
| Inpatient | $20,759,275 | $0 | $0 | - | $20,759,275 | $0 | $20,759,275 |
| Emergency | 13,443,871 | 0 | 0 | 0 | 13,443,871 | 0 | $13,443,871 |
| Observation | 2,047,735 | 0 | 0 | 0 | 2,047,735 | 0 | $2,047,735 |
| Outpatient | 11,729,209 | 0 | 0 | 0 | 11,729,209 | 0 | $11,729,209 |
| Long-term Care | 0 | 3,616,867 | 0 | 0 | 3,616,867 | 0 | $3,616,867 |
| EMS | 0 | 0 | 1,892,758 | 0 | 1,892,758 | 0 | $1,892,758 |
| Physician Offices | 0 | 0 | 0 | 4,712,030 | 4,712,030 | 0 | $4,712,030 |
| Total Patient Revenue | 47,980,090 | 3,616,867 | 1,892,758 | 4,712,030 | 58,201,745 | 0 | $58,201,745 |
| **Revenue Deductions** | | | | | | | |
| Medicare | 20,837,652 | 39,839 | 464,095 | 0 | 21,341,586 | 0 | $21,341,586 |
| Medicaid | 5,879,373 | 171,530 | 122,847 | 0 | 6,173,750 | 0 | $6,173,750 |
| Managed Care/Commercial | 3,675,937 | 0 | 44,727 | 0 | 3,720,664 | 0 | $3,720,664 |
| Charity Care | 2,034,200 | 0 | 0 | 0 | 2,034,200 | 0 | $2,034,200 |
| Other | 2,710,948 | 0 | 5,464 | 2,461,377 | 5,177,789 | 0 | $5,177,789 |
| Provision for Uncollectibles-Net | 1,713,027 | 289,133 | 452,224 | 179,191 | 2,633,575 | 0 | $2,633,575 |
| Total Revenue Deductions | 36,851,137 | 500,502 | 1,089,357 | 2,640,568 | 41,081,564 | 0 | $41,081,564 |
| **Net Patient Revenue** | 11,128,954 | 3,116,365 | 803,401 | 2,071,461 | 17,120,181 | 0 | $17,120,181 |
| Other Operating Revenue | 3,181,487 | 720,015 | 3,190 | 20,951 | 3,925,643 | 0 | $3,925,643 |
| **Net Operating Revenue** | 14,310,440 | 3,836,380 | 806,591 | 2,092,412 | 21,045,823 | 0 | $21,045,823 |
| **Operating Expense** | | | | | | | |
| Salaries & Wages | 6,379,994 | 1,587,647 | 597,742 | 2,560,228 | 11,125,610 | 0 | $11,125,610 |
| Fringe Benefits | 2,722,137 | 419,288 | 141,779 | 308,317 | 3,591,520 | 0 | $3,591,520 |
| Contract Labor | 470,116 | 102,197 | 15,594 | 3,971 | 591,878 | 0 | $591,878 |
| Professional Fees | 810,383 | 340,536 | 85,341 | 636,678 | 1,872,938 | 0 | $1,872,938 |
| Purchased Services | 1,170,832 | 126,733 | 83,275 | 174,089 | 1,554,929 | 0 | $1,554,929 |
| Insurance | 147,684 | 36,403 | 18,525 | 77,043 | 279,656 | 0 | $279,656 |
| Utilities | 462,201 | 94,135 | 64,677 | 53,495 | 674,507 | 0 | $674,507 |
| Supplies | 1,747,313 | 396,557 | 31,382 | 128,877 | 2,304,128 | 0 | $2,304,128 |
| Other | 666,032 | 300,773 | 3,754 | 72,829 | 1,043,389 | 0 | $1,043,389 |
| Interest | 243,922 | 19 | 0 | 0 | 243,941 | 0 | $243,941 |
| Depreciation/Amortization | 1,157,197 | 68,794 | 59,014 | 55,188 | 1,340,192 | 0 | $1,340,192 |
| Total Operating Expense | 15,977,811 | 3,473,080 | 1,101,083 | 4,070,714 | 24,622,689 | 0 | $24,622,689 |
| **INCOME FROM OPERATIONS** | (1,667,370) | 363,300 | (294,492) | (1,978,302) | (3,576,865) | 0 | ($3,576,865) |
| Operating Margin % | -11.65% | 9.47% | -36.51% | -94.55% | -17.00% | 0.00% | -17.00% |
| Operating Cash Flow % | -1.86% | 11.26% | -29.19% | -91.91% | -9.47% | 0.00% | -9.47% |
| **Non-Operating Rev (Exp)** | | | | | | | |
| Interest and Dividend Income | 295 | 16 | 0 | 0 | 311 | 0 | $311 |
| Net Inc (Dec) in Fair Value of Investments: | | | | | | | $0 |
| Realized Gains (Losses) | 0 | 0 | 0 | 0 | 0 | 0 | $0 |
| Unrealized Gains (Losses) | (93) | 0 | 0 | 0 | (93) | 0 | ($93) |
| Subtotal | 202 | 16 | 0 | 0 | 218 | 0 | $218 |
| Donations | 3,909 | 0 | 130,000 | 0 | 133,909 | 0 | $133,909 |
| Other | 0 | 0 | 300,000 | 0 | 300,000 | 0 | $300,000 |
| Total Non-Operating Rev (Exp) | 4,111 | 16 | 430,000 | 0 | 434,127 | 0 | $434,127 |
| **Excess Revenue Over Expense** | (1,663,259) | 363,316 | 135,508 | (1,978,302) | (3,142,738) | | (3,142,738) |
| Total Margin % | -11.62% | 9.47% | 10.96% | -94.55% | -14.63% | 0.00% | -14.63% |

No. 848]                    OF SOUTH CAROLINA                    2521

**SECTION 7: Payment of bonds.**—That the officers of Union County charged with the assessment and collection of taxes shall, at the direction of the School Trustees of Kelly-Pinckney School District No. 18, levy and collect such tax annually upon all property, real or personal, within Kelly-Pinckney School District No. 18, as will raise a sum sufficient to pay the interest and principal on said bonds, as the same shall become due.

**SECTION 8: Repeal.**—All Acts or parts of Acts inconsistent herewith are hereby repealed.

**SECTION 9: Time effective.**—This Act shall become effective immediately upon its approval by the Governor.

Approved the 28th day of March 1946

**No. 848**

(R386, H1022, S888)

**AN ACT To Create And Establish A Hospital District For Union County To Be Known As Union Hospital District; To Prescribe Its Duties And Define Its Powers And Authority; To Authorize And Empower The Trustees Of Union Hospital District To Order And Hold An Election For The Purpose Of Issuing Coupon Bonds For Hospital Purposes; To Provide For The Construction, Maintenance And Establishment Of A Public Hospital For Union Hospital District; And To Protect And Promote The Public Health.**

BE IT ENACTED by the General Assembly of the State of South Carolina:

**SECTION 1: Union hospital district, Union County.**—That there be, and there is hereby, created and established in Union County a district to be known as "Union Hospital District", with such duties, powers and authority as herein provided and conferred and which shall be a body politic and corporate, and shall be subject to the rules, regulations and provisions hereinafter contained, and shall include and be comprised of all the territory in Union County within the boundaries of Union County.

**SECTION 2: Board of trustees—treasurer.**—The Union Hospital District shall be governed by a Board composed of seven (7) members, which shall be known as the Union Hospital District Board

---

2520                    STATUTES AT LARGE                    [No. 847

in the Union-Daily Times, a County Newspaper. Such notice shall state the question to be voted upon, shall state the time and place or places at which said election shall be held. Said Trustees shall likewise appoint the managers of such election, receive the return and determine the result.

**SECTION 3: Ballots—voting.**—The School Trustees of Kelly-Pinckney School District No. 18 shall have printed and provided for the use of the voters a sufficient number of ballots which shall be placed at the voting place or places with the following words plainly printed thereon:

"For the issuance of School Bonds
Against the issuance of School Bonds.

(Those voting in favor of such bonds will strike out the words 'against the issuance of School, Bonds' and those voting against the issuance of such bonds will strike out the words 'for the issuance of School bonds)".

**SECTION 4: Issue bonds if election favorable—maturities—sale—interest.**—If a majority of the votes cast at said election shall be in favor of issuing said bonds, the School Trustees shall issue said bonds as coupon bonds, the first of which shall mature during the year 1947 and the last during the year 1976 —, the amount to mature in any one year shall be in the discretion of and determined by the School Trustees, Said bonds shall be sold at public or private sale at not less than par and accrued interest, and the proceeds therefrom shall be used for the purposes mentioned in Section 1 hereof, PROVIDED, That said bonds so sold shall not bear a rate of interest in excess of four (4%) per centum, payable semi-annually, and the principal and interest thereof shall be payable at such time and places as said School Trustees may prescribe.

**SECTION 5: Bonds—execution.**—That said School bonds shall be signed by the Chairman of the Board of School Trustees and countersigned by the Secretary; PROVIDED, That the signature of the Chairman and the Secretary may be lithographed or engraved upon the attached coupon, to such bonds, and such lithographed or engraved signatures shall be sufficient signing thereof.

**SECTION 6: Bonds exempt from taxes.**—That said bonds when issued shall be exempt from taxation for State, and County purposes.

EXHIBIT
2

2522        STATUTES AT LARGE        [No. 848

of Trustees. Three (3) of the members of said Board of Trustees shall be medical doctors and practicing physicians within the Union Hospital District and Four (4) of the members of said Board of Trustees shall be resident citizens within the Union Hospital District. The members of the Union Hospital District Board of Trustees shall be appointed by the Governor upon the recommendation of the Union County Legislative Delegation of the General Assembly of the State of South Carolina, or, of a majority thereof. The initial term of office of the first trustee shall be designated for a period of one (1) year; of the second trustee, for a period of two (2) years; of the third trustee, for a period of three (3) years; of the fourth trustee, for a period of four (4) years; of the fifth trustee, for a period of five (5) years; of the sixth trustee, for a period of six (6) years; and of the seventh trustee, for a period of seven (7) years; and thereafter the term of office of the successor of each initial appointee shall be for a period of seven (7) years. Any vacancy occurring in the office of trustee by death, resignation or otherwise shall be filled in like manner by appointment for the unexpired term. Upon appointment the members of the Union Hospital District Board of Trustees shall qualify by taking the oath required of other officers of the State, and organize as the Union Hospital District Board of Trustees by the election of one of their members as chairman and one as secretary, and by the election of such other officers as they may deem necessary, but no bonds shall be required of them. The treasurer of Union County shall be the treasurer of the Union Hospital District Board of Trustees. He shall receive and pay out all moneys under the control of said board as directed by it, but shall receive no compensation for his services, and no trustee shall receive compensation for his services, but he may receive reimbursement for any cash expenditures actually made for personal expenses incurred as such trustee. The Union Hospital District Board of Trustees shall adopt an official seal and they shall procure office quarters within the Union Hospital District where all formal meetings shall be held, and all records kept.

**SECTION 3: Establish, equip and operate hospital.**—The Union Hospital District Board of Trustees shall have power to build, construct, establish, extend, maintain and operate a public hospital in the Union Hospital district for the accommodation and benefit of the public subject to the rules and regulations of the Union Hospital District Board of Trustees and the provisions of this Act; to purchase, lease and hold real estate, easements, water rights and property rights rea-

No. 848]        OF SOUTH CAROLINA        2523

sonably necessary in their judgment for carrying out the purposes of this Act; to purchase or lease or acquire by gift or otherwise existing hospitals or hospital equipment and to make all lawful contracts reasonably promotive of achieving the principal purposes of this Act so that the Union Hospital District may be adequately served by a public hospital.

**SECTION 4: Hospital site.**—The Union Hospital District Board of Trustees shall have power to locate and acquire the site of the public hospital in Union Hospital District.

**SECTION 5: Conduct of hospital—meetings—buildings.**—The Union Hospital District Board of Trustees shall adopt and promulgate such rules, regulations and by-laws for the government of the public hospital as may be deemed expedient for the economic and equitable conduct thereof. They shall have control of the expenditure of all moneys collected to the credit of the public hospital, the construction of any building or buildings, and the care of the grounds, rooms and buildings purchased. They shall also have the power to appoint a Superintendent, and Assistant Superintendent, and Matron, and fix their compensation, and do all things necessary to carry out the spirit of interest for the establishment and maintenance of said public hospital. They shall hold meetings at least once each month, and shall keep a complete record of all proceedings, and no hospital building shall be erected or constructed until plans and specifications have been made therefor and adopted by the Union Hospital District Board of Trustees, and bids advertised for according to the law and custom of other public buildings.

**SECTION 6: Gifts.**—Any person, firm or corporation or association desiring to make donations of money, personal property, or real estate for the benefit of such public hospital shall have the right to vest title of the property so donated to the Union Hospital District, to be controlled when accepted by the Union Hospital District Board of Trustees according to the terms of the deed or gifts.

**SECTION 7: Patients—payment for services.**—The public hospital established under the provisions of this Act shall be for the benefit of the inhabitants of the Union Hospital District, and any person failing sick, or being injured or maimed within its limit; but every person who is financially able, shall pay to the Union Hospital District Board of Trustees or such officers as it shall designated for

2524                STATUTES AT LARGE                [No. 848]

such public hospital such reasonable compensation as he or she is able to pay for occupying, nursing, caring for an maintaining patients according to the rules and regulations of the Union Hospital District Board of Trustees.

SECTION 8: Municipal and county jurisdictions — doctors — nurses — patients.—The jurisdiction of the city or town in or near which the public hospital is located, and the jurisdiction of Union County, shall extend over all the land used for the public hospital outside the incorporate limits, and all ordinances of such city or town shall be in full force and effect in and over the territory occupied by such public hospital. In the management of such public hospital no discrimination shall be made against any practitioner of any school of medicine recognized by the laws of South Carolina, and all such legal practitioners have the privilege of treating patients in such hospital, and the Union Hospital District Board of Trustees may establish and maintain in connection therewith as a part of the said public hospital a training school for nurses and a nurses' home and quarters for the accommodation and convenience of nurses. In order to render the public hospital of greates use to the greatest number, the Union Hospital District Board of Trustees may exclude from the use of such public hospital any such persons who shall wilfully violate such rules and regulations made by the board of trustees; and the board may extend the privileges and use of such public hospital to persons residing outside the Union Hospital District upon terms and conditions as may be prescribed from time to time by its rules and regulations.

SECTION 9: Condemn property.—The Union Hospital District Board of Trustees shall have the power to condemn for the purposes of this Act, lands, easements, water rights and property rights in all cases where any of these things are reasonably required for carrying out this Act, and cannot be obtained by contract from the owner or owners, which the Union Hospital District Board of Trustees is willing to make; the right of condemnation to be exercised in the same manner as prescribed for the condemnation of rights-of-way by counties under Section 5813, Vol. III, Code of Laws of South Carolina, 1942, and Acts amendatory thereof.

SECTION 10: Issue bonds of election thereon favorable.—That the Union Hospital District Board of Trustees of Union Hospital District, County of Union and State of South Carolina, be, and they

No. 848]                OF SOUTH CAROLINA                2525

are hereby, authorized and empowered to issue and sell Coupon Bonds of said Union Hospital District in the sum of not exceeding Five Hundred Thousand ($500,000.00) Dollars, or so much thereof as they may deem necessary for the purpose of acquiring property, erecting or enlarging building or buildings and purchasing equipment for the construction, establishment and maintenance of a public hospital and appurtenances in Union Hospital District, or for paying any indebtedness incurred for said purposes; PROVIDED, that a majority of the voters of said Union Hospital District voting thereon at an election as hereafter provided shall vote in favor of issuing said hospital bonds.

SECTION 11: Bond election.—That for the purpose of determining whether or not hospital bonds shall be issued, as provided in Section 10, the Union Hospital District Board of Trustees of Union Hospital District shall order an election to be held at such place or places in said Union Hospital District as may be designated, in which election only qualified electors residing in the Union Hospital District shall be allowed to vote; and said Union Hospital District Board of Trustees shall give such notice of such election as they shall deem necessary and proper; PROVIDED, that such notice shall appear at least once ten (10) days prior to the date of such election in a newspaper published in Union Hospital District. Such notice shall state the time and place or places at which said election shall be held. The said Union Hospital District Board of Trustees shall likewise appoint the managers of such election, receive the returns and determine the results.

SECTION 12: Bond election — ballots — voting.—The Union Hospital District Board of Trustees of Union Hospital District shall have printed and provided for the use of the voters a sufficient number of ballots, which shall be placed at the voting place or places, on which shall be printed the words, "For the issue of Hospital Bonds", and the words, "Against the issue of Hospital Bonds", and the voters voting for the issue of the bonds shall strike out the words, "Against the issue of Hospital Bonds", and the voters against the issue of the bonds shall strike out the words, "For the Issue of Hospital Bonds".

SECTION 13: Bonds — maturities — call — interest.—If a majority of the votes cast at said election shall be in favor of issuing said bonds, the Union Hospital District Board of Trustees shall issue said bonds as serial bonds, the first of which shall mature during the year 1947

2526    STATUTES AT LARGE    [No. 848

and end with the year 1971; the amount to mature in any one year shall be at the discretion of and determined by the Union Hospital District Board of Trustees. Said bonds shall be sold at public sale at not less than par and accrued interest, and the proceeds therefrom shall be used for the purposes mentioned in Section 10 hereof; PROVIDED, that said bonds so sold shall not bear a rate of interest in excess of four (4%) per centum per annum, payable semi-annually, and the principal and interest thereof shall be payable at such time and places as said Union Hospital District Board of Trustees may prescribe.

SECTION 14: **Bonds—execution.**—That said Hospital bonds shall be signed by the Chairman of the Union Hospital District Board of Trustees and countersigned by the Secretary: PROVIDED, that the signatures of the Chairman and the Secretary may be lithographed or engraved upon the coupons attached to such bonds, and such lithographed or engraved signatures shall be a sufficient signing thereof.

SECTION 15: **Bonds—exempt from taxes.**—That said bonds when issued shall be exempt from taxation for State, County and Municipal purposes.

SECTION 16: **Bonds—payment.**—That the officers of Union County charged with the assessment and collection of taxes shall, at the direction of the Union Hospital District Board of Trustees of Union Hospital District, levy and collect such a tax annually upon all property, real or personal, within Union Hospital District, as will raise a sum sufficient to pay the principal and interest on said bonds, as the same shall become due.

SECTION 17: **Bonds—pledge pay.**—The full faith, credit and taxing power of Union Hospital District are hereby irrevocably pledged for the punctual payment of the principal and interest of said bonds as such principal and interest become due.

SECTION 18: **Repeal.**—All Acts or parts of Acts inconsistent with this Act are hereby repealed.

SECTION 19: **Time effective.**—This Act shall take effect immediately upon its approval by the Governor.

Approved the 13th day of March, 1946

---

No. 850]    OF SOUTH CAROLINA    2527

(3362, H1131, S906)    **No. 849**

**AN ACT To Transfer To And Confer Upon The Union Hospital District Board of Trustees All The Rights, Title, Interest, Power, Authority, And Duties And Responsibility Of Union County In And To The Wallace Thompson Hospital In The City Of Union, County Of Union And State Of South Carolina.**

BE IT ENACTED by the General Assembly of the State of South Carolina:

SECTION 1: **Wallace Thompson hospital transferred to Union hospital district, Union County.**—That all the rights, title, interest, powers and authority, and the duties and responsibility of Union County, in and to the Wallace Thompson Hospital, located in the City of Union, County of Union and State of South Carolina, be, and the same are hereby transferred to and conferred upon the Union Hospital District Board of Trustees of Union Hospital District in Union County; and the said Union Hospital District Board of Trustees shall have sole authority and exclusive jurisdiction of the same for public hospital purposes.

SECTION 2: **Repeal.**—All Acts or parts of Acts inconsistent with this Act are hereby repealed.

SECTION 3: **Time effective.**—This Act shall take effect upon its approval by the Governor.

Approved the 13th day of March, 1946

---

(3394, H1276, S1132)    **No. 850**

**A JOINT RESOLUTION. Proposing An Amendment To Section 5, Article 10, Of The Constitution Of South Carolina, 1895, So As To Authorize Union Hospital District Of Union County, South Carolina, To Issue Bonds In An Amount Equal To Twenty (20) Per Centum Of The Value Of The Taxable Property Embraced In Said Hospital District, Provided The Qualified Electors Of Said District Vote Favorably Thereon.**

BE IT RESOLVED by the General Assembly of the State of South Carolina:

No. 851]                    OF SOUTH CAROLINA                    2529

**SECTION 3: Time effective.**—This Resolution shall take effect upon its approval by the Governor.

Approved the 23rd day of March, 1946

(R563, H1032, S891)                    No. 851

**AN ACT To Authorize The School Trustees Of Union School District No. 11 To Order And Hold An Election For The Purpose Of Issuing Coupon Bonds For School Purposes.**

BE IT ENACTED by the General Assembly of the State of South Carolina:

**SECTION 1: Union school district No. 11 issue bonds for improvements, Union County.**—That the School Trustees of Union School District No. 11, County of Union and State of South Carolina, be, and they are hereby, authorized and empowered to issue and sell coupon bonds of said School District in the sum of not exceeding three hundred thousand ($300,000.00) dollars, or so much thereof as they may deem necessary for the purpose of acquiring additional property, erecting or enlarging building or buildings, and purchasing equipment for public schools in said School District, or for paying any indebtedness incurred for said purposes; PROVIDED, That a majority of the voters of said School District voting thereon at an election as hereafter provided shall vote in favor of issuing said school bonds.

**SECTION 2: Election on issuance—notice—managers.**—That for the purpose of determining whether or not school bonds shall be issued, as provided in Section 1, the School Trustees of Union School District No. 11 shall order an election to be held at such place or places in said School District as may be designated, in which election only qualified electors residing in the School District shall be allowed to vote; and said School Trustees shall give such notice of such election as they shall deem necessary and proper; PROVIDED, That such notice shall appear at least once ten (10) days prior to the date of such election in a newspaper published in said District. Such notice shall state the question to be voted upon, shall state the time and place or places at which said election shall be held. Said School Trustees shall likewise appoint the managers of such election, receive the returns and determine the results.

2528                    STATUTES AT LARGE                    [No. 850

**SECTION 1: Amendment to article 10, § 5, State Constitution, proposed bonded indebtedness, Union hospital district, Union County.**—That the following Amendment to Section 5, Article 10, of the Constitution of South Carolina,1895, be agreed to, to-wit: Add at the end of said section, the following:

"PROVIDED, That the limitations imposed by this Section shall not apply to Union Hospital District, Union County, State of South Carolina, said Union Hospital District being hereby expressly authorized to issue bonds to an amount not to exceed twenty (20) per ventum of the value of all taxable property embraced in said hospital district, as valued or assessed for taxation by the State, the proceeds of such bonds to be applied solely to the purpose of acquiring property, erecting or enlarging building or buildings and purchasing equipment for the construction, establishing and maintenance of a public hospital and appurtenances in said Union Hospital District or paying any indebtedness incurred for said purposes, under such restrictions and limitations as the General Assembly may prescribe, and where the question of incurring such indebtedness is to be submitted to the qualified electors of said Union Hospital District, as provided in the Constitution upon the question of bonded indebtedness."

**SECTION 2: Submission to electors.**—That the question of the adoption of this amendment be submitted to the qualified electors of this State at the next election held for members of the House of Representatives of this State, and there shall be furnished at the voting places in this State a sufficient number of ballots, with the following words plainly written or printed thereon: "Amendment to Section 5, Article 10, Constitution of South Carolina,1895, proposed by a Joint Resolution, entitled " A Joint Resolution proposing an Amendment to Section 5, Article 10, of the Constitution of South Carolina, 1895, so as to Authorize Union Hospital District of Union County, South Carolina, to Issue Bonds in an Amount Equal to Twenty (20) Per Centum of the Value of the Taxable Property Embraced in Said Hospital District, Provided the Qualified Electors of Said District Vote Favorably thereon." Yes_____ No._____ Those voting in favor of the amendment shall erase the word "No". Those against the amendment shall erase the word "Yes".